23-MJ-7081-JCB
23-MJ-7082-JCB
23-MJ-7083-JCB

## AFFIDAVIT OF SPECIAL AGENT MICHAEL ROMEO
## IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Michael Romeo, being sworn, state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have been employed as an ATF Special Agent since 2016 and currently am assigned to the Boston Group II Field Office. As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center. During the course of my law enforcement career, I have participated in the execution of state and federal search and/or arrest warrants for violations of firearms and narcotics laws.

2.    As a Special Agent for ATF, some of my duties include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, firearms manufacturing, and violent crimes involving firearms and narcotics trafficking. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms. I have been the affiant on affidavits in support of federal search warrants and arrest warrants. I have participated in and performed surveillance and made arrests of firearm and narcotics traffickers who utilize their electronic devices to further their illegal activity. During the course of my professional experience, I have interviewed numerous defendants, witnesses, victims, confidential informants, and police officers regarding the illegal trafficking of firearms.

3.    During my tenure with ATF, I have written and/or participated in the execution of

1

federal search warrants, and have debriefed defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized me with: (1) the manner in which illegal guns are brought into Massachusetts and sold; (2) firearm and narcotics traffickers' methods of operation, including their acquisition, storage, and transportation of both illegal guns and drugs; and (3) the widespread utilization of cellular telephones in the course of such activities.

## II.    PURPOSE OF AFFIDAVIT

4.    This affidavit is submitted in furtherance of an ongoing criminal investigation into Klordenzsky SENECHARLES (DOB XX/XX/1996), and others yet unknown, concerning violations of federal law, including Title 18 U.S.C. § 922(a)(1) (for an individual to be dealing in firearms without a license) and 18 U.S.C. § 922(a)(6) (knowingly provide false statements, either orally or in writing, during the course of purchasing a firearm) (the "TARGET OFFENSES").

5.    I further submit this affidavit in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, associated with the Apple Accounts identified as follows (collectively, the "TARGET ACCOUNTS"):

a.    23-MJ-7081-JCB:    data, information, and content related to the Apple Account associated with email address ▮▮▮▮▮▮▮@icloud.com and identified by the Apple Account identifying number (DS ID) 16470648379, and other data associated with this account, as described in Attachment A-1, believed to be used and/or controlled by SENECHARLES ("TARGET ACCOUNT 1"). There is probable cause

2

to believe that TARGET ACCOUNT 1 is an instrumentality of the TARGET OFFENSES, and contains fruits and/or evidence of the TARGET OFFENSES, as described in Attachment B.

b.      23-MJ-7082-JCB:   data, information, and content related to the Apple Account associated with email address ███ @icloud.com and identified by the Apple Account identifying number (DS ID) 17340051461, and other data associated with this account, as described in Attachment A-2, believed to be used and/or controlled by SENECHARLES ("TARGET ACCOUNT 2"). There is probable cause to believe that TARGET ACCOUNT 2 is an instrumentality of the TARGET OFFENSES, and contains fruits and/or evidence of the TARGET OFFENSES, as described in Attachment B.

c.      23-MJ-7083-JCB: data, information and content related to the Apple Account associated with email address ███ @gmail.com and identified by the Apple Account identifying number (DS ID) 20115485978, and other data associated with this account, as described in Attachment A-3, believed to be used and/or controlled by SENECHARLES ("TARGET ACCOUNT 3"). There is probable cause to believe that TARGET ACCOUNT 3 is an instrumentality of the TARGET OFFENSES, and contains fruits and/or evidence of the TARGET OFFENSES, as described in Attachment B.

6.      I am seeking the data and information related to the TARGET ACCOUNTS for the period of January 1, 2020 to present because SENECHARLES made his first purchase of a firearm in apparent commission of the TARGET OFFENSES on March 12, 2020 and firearms purchased by SENECHARLES have been used in connection with criminal activity as recently as late October of

3

2022, as is described in more depth below.

7.      The data and information being sought as to the TARGET ACCOUNTS is stored at premises owned, maintained, controlled, or operated by Apple, an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be disclosed by Apple for the TARGET ACCOUNTS and searched by the government is described in the following paragraphs and in Attachments A-1, A-2, and A-3, incorporated herein. There is probable cause to believe that the TARGET ACCOUNTS contain evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES as described further in Attachment B, incorporated herein. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is being submitted for the limited purpose of showing that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## STATEMENT OF PROBABLE CAUSE

### I.      OVERVIEW OF INVESTIGATION

9.      On June 4, 2021, the Boston Police Department ("BPD") recovered a Taurus G23 9mm Pistol bearing serial number ABM287758 ("FIREARM 1") pursuant to a shots-fired call in the area of 36 Georgetown Drive, Hyde Park, MA. No arrests were made for this incident. It is an open investigation.

10.     ATF traced the serial number of FIREARM 1 and found that SENECHARLES had purchased the firearm from On Target Training Inc. in East Bridgewater, Massachusetts on January

4

2, 2021. Investigators learned through an ATF "Multiple Sale Report"[1] that FIREARM 1 was part of a "multiple-sale," in which SENECHARLES also had purchased a Taurus G23 9MM Pistol bearing serial number ABM250933. ATF observed that SENECHARLES also has two additional "multiple-sales."

11.    In June 2021, ATF's Boston Group II began investigating SENECHARLES following the recovery of FIREARM 1. Investigators learned that SENECHARLES had an active Massachusetts License to Carry ("LTC") and had purchased 28 firearms from Federal Firearm Licensees ("FFLs") in Massachusetts between March 2020 and May 2021.

12.    Investigators also learned that a firearm assigned to SENECHARLES—a Ruger, SR40C, .40 caliber Pistol bearing serial number 342-39913 ("FIREARM 2")—had been recovered in Boston on December 27, 2020, at the scene of an attempted homicide. No arrests were made for this incident. It is an open investigation.

13.    SENECHARLES was not the original purchaser of FIREARM 2, but according to Massachusetts Criminal Justice Information System ("CJIS") records he had purchased the firearm on August 13, 2020, such that it was assigned to him at the time of its recovery.

14.    At this stage of the investigation, investigators queried CJIS, which indicated that SENECHARLES was the assigned owner of 24 firearms. The 24 firearms assigned to SENECHARLES and purchased originally between March 2020 and May of 2021 included:[2]

---

[1]    An ATF "Multiple Sale Report" form contains information reported to the ATF by a Federal Firearm Licensee that documents the sale of two or more handguns to the same individual either at the same time or in multiple sales within five days of one another.

[2]    The five firearms, including FIREARM 1 and FIREARM 2, that were purchased by SENECHARLES and subsequently recovered in connection with criminal activity are highlighted in yellow in Table A below. Additional information as to the firearms identified as FIREARM 3, FIREARM 4, and FIREARM 5 will be provided in the paragraphs that follow.

23-MJ-7081-JCB
23-MJ-7082-JCB
23-MJ-7083-JCB

| TABLE A | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| (Note: Yellow shading indicates the firearm was recovered.) | | | | | | |
| # | Manufacturer | Type | Serial # | Model | Caliber | Purchase Date |
| 1 | Walter | Handgun | WAZ59769 | P22 | 22 | 03/12/20 |
| 2 | Smith & Wesson | Handgun | FZM2830 | SD40VE | 40 | 05/21/20 |
| 3 | FN | Handgun | GK50071351 | 509 | 9MM | 06/04/20 |
| 4 | Ruger (FIREARM 2) | Handgun | 342-39913 | SK40 | 40 | 08/13/20 |
| 5 | Smith & Wesson | Handgun | FZF3495 | SD40VE | 40 | 08/18/20 |
| 6 | Smith & Wesson | Handgun | HXE6633 | M&P 45 Shield | 45 | 08/28/20 |
| 7 | Glock | Handgun | BHC344US | 22 | 40 | 09/25/20 |
| 8 | Smith & Wesson | Handgun | HZS4890 | M&P 45 Shield | 45 | 09/25/20 |
| 9 | Smith & Wesson (FIREARM 5) | Handgun | KFW4330 | Bodyguard 380 | 380 | 10/15/20 |
| 10 | Smith & Wesson | Handgun | KHP7921 | Bodyguard 380 | 380 | 10/15/20 |
| 11 | Smith & Wesson | Handgun | KHS1419 | Bodyguard 380 | 380 | 10/26/20 |
| 12 | Kahr | Handgun | VA3567 | PM9 | 9MM | 12/09/20 |
| 13 | Smith & Wesson | Handgun | PDY9584 | SW9VE | 9MM | 12/09/20 |
| 14 | Glock | Handgun | CDT165US | 22 | 40 | 12/31/20 |
| 15 | Taurus (FIREARM 1) | Handgun | ABM250933 | G3C | 9MM | 12/31/20 |
| 16 | Glock | Handgun | AKVO97 | | 40 | 12/31/20 |
| 17 | Taurus | Handgun | ABM287758 | G3C | 9MM | 01/02/21 |
| 18 | Taurus (FIREARM 3) | Handgun | ABM250648 | G3C | 9MM | 01/14/21 |
| 19 | Springfield (FIREARM 4) | Handgun | HG112484 | XD45 | 45 | 01/19/21 |
| 20 | Glock | Handgun | BKX615US | 22 | 40 | 02/13/21 |

| 21 | Glock | Handgun | BTE588US | 19 | 9MM | 02/25/21 |
| 22 | Springfield | Handgun | B4561044 | XDS Mod 2 | 9MM | 03/13/21 |
| 23 | IAI | Handgun | M12187 | Backup 380 | 380 | 04/22/21 |
| 24 | Taurus | Handgun | ACD159933 | G3C | 9MM | 05/20/21 |

15. According to CJIS, between December 2020 and February of 2021, SENECHARLES resold four of the original 28 firearms that he had purchased between March 2020 and May of 2021. These four resold firearms include the following:

| TABLE B | | | | | | | |
|---|---|---|---|---|---|---|---|
| # | Manufacturer | Type | Serial # | Model | Caliber | Purchase Date | Sale Date |
| 1 | Tri Star | Shotgun | KRP021259 | Cobra III | 12GA | 12/03/20 | 12/11/20 |
| 2 | Smith & Wesson | Handgun | CVK5076 | Bodyguard | 38 | 02/12/21 | 02/13/21 |
| 3 | Ruger | Handgun | 641-96710 | 57 | | 02/12/21 | 03/06/21 |
| 4 | Sig Sauer | Handgun | 66b300154 | P365 | 9MM | 02/23/21 | 02/26/21 |

16. On October 4, 2021, investigators interviewed SENECHARLES outside of his residence at ███████████ Brockton, Massachusetts, 02301 regarding his suspected involvement in firearms trafficking activities.

17. During this October 4, 2021 interview, investigators asked SENECHARLES how many firearms he currently owned. SENECHARLES stated that he owned two firearms. SENECHARLES stated that he owned a Glock 17 and an XD45, which were located in a safe at SENECHARLES's mother's home at ███████████ Brockton, Massachusetts, 02301.

18. Investigators asked SENECHARLES how many firearms he had purchased, and he stated approximately 12. Investigators informed SENECHARLES that a query of his Massachusetts Firearms Ownership revealed that between March 2020 and May 2021, he had purchased 28 firearms from multiple FFLs located throughout Massachusetts, and that 24 of the firearms still had him listed

7

as the current owner (see Table A above).

19.   Investigators informed SENECHARLES that if he was not truthful with them, he could be charged with a felony. At this time, investigators asked SENECHARLES to review the list of 24 firearms to identify where they were located.   SENECHARLES agreed to review the list. SENECHARLES stated that he sold: 11 firearms to Steve's Tactical in Stoughton, MA; four firearms to Outer Limits Pro Shop, in Holbrook, MA; two firearms to On Target Training in East Bridgewater, MA; two firearms to J&J Arms in Dedham, MA; one firearm to Fat Cat in Bridgewater, MA; and one firearm to American Firearms in North Attleboro, MA. SENECHARLES stated that he did not recall two of the firearms, specifically the Ruger with serial number 342-39913, and the Smith & Wesson with serial number PDY9584. Additionally, SENECHARLES stated that one of the firearms, the Walter with serial number WAZ59769, was located at his mother's house. In connection with this discussion, SENECHARLES showed law enforcement photographs that he had saved on his cell phone of approximately four or five of the 28 firearms that he had purchased.

20.   At this time, investigators provided SENECHARLES with a Target Letter, which had been prepared by the United States Attorney's Office. The letter served as a formal notification to SENECHARLES that he is a target of a firearms trafficking investigation. Investigators advised SENECHARLES that he should retain an attorney and contact the Assistant United States Attorney ("AUSA") listed on the Target Letter regarding next steps.

21.   Following the interview, investigators contacted each FFL that SENECHARLES had identified as an FFL to which he had sold firearms. The FFLs each reviewed their records and all informed investigators that they had not received any of the 21 firearms that SENECHARLES had claimed he sold to them.

22.   On October 8, 2021, investigators called SENECHARLES's cell phone,

6041, to follow up regarding his suspected involvement in firearms trafficking activities. Investigators asked SENECHARLES whether he had acquired an attorney and contacted the AUSA regarding the Target Letter. SENECHARLES stated that he did not have an attorney and he did not contact the AUSA. SENECHARLES asked investigators about the status of the investigation. Investigators informed SENECHARLES that they had contacted the FFLs he claimed to have sold his firearms to and that the FFLs had informed the investigators that they had not received or purchased any of SENECHARLES's 24 firearms. Investigators then asked SENECHARLES how many firearms he currently owned. SENECHARLES stated that he did not own any firearms at this time. SENECHARLES then asked investigators how much trouble he was in. Investigators informed SENECHARLES that it was in his best interest to be truthful with investigators and to contact the AUSA to arrange a meeting. SENECHARLES then told investigators that he was going to contact the AUSA regarding next steps.

23.    On July 12, 2021, the Philadelphia Police Department recovered a Taurus G3C 9mm Pistol bearing serial number ABM250648 ("FIREARM 3"). The firearm was located on Ford Road and Greenland Drive and was loaded with 11 live 9mm rounds. FIREARM 3 was purchased by SENECHARLES on January 14, 2021, at On Target Training, in East Bridgewater, Massachusetts 02333. During the October 4, 2021 interview, SENECHARLES had informed investigators that he sold FIREARM 3 to Steve's Tactical, but when investigators contacted Steve's Tactical, they stated that they had never purchased FIREARM 3 from SENECHARLES.

24.    On January 3, 2022, the Massachusetts State Police ("MSP") recovered a Springfield XDS .45 pistol, bearing serial number HG112484 ("FIREARM 4"). FIREARM 4 was recovered during the execution of search warrant of 85 Breer Circle in Brockton, Massachusetts. The search warrant was executed in connection with an investigation into narcotics distribution in Plymouth

9

County. According to the MSP's report, FIREARM 4 was recovered in the bedroom of Derek DEPINA (DOB xx/xx/1993). DEPINA subsequently was charged with multiple firearm and narcotics violations and his criminal record reflects that he has been charged with and/or convicted of multiple narcotics felonies in the past. FIREARM 4 was purchased by SENECHARLES on January 19, 2021, at On Target Training, in East Bridgewater, Massachusetts, 02333. During the October 4, 2021 interview, SENECHARLES had informed investigators that he sold FIREARM 4 to Steve's Tactical, but when investigators contacted Steve's Tactical, they stated that they never purchased FIREARM 4 from SENECHARLES.

25.    The MSP subsequently conducted a forensic analysis of FIREARM 4 at their Crime Laboratory. This analysis indicated that FIREARM 4 had fired five .45 Auto caliber cartridge casings in connection with a homicide that was committed on approximately September 9, 2021. The homicide victim was shot in the head and in each of his left and right shins while in the driveway of his residence at ▮▮▮▮▮▮▮▮▮ in Brockton, Massachusetts. The five discharged cartridge cases to which FIREARM 4 matched when it was recovered approximately four months later had been recovered from the scene.

26.    On June 8, 2022, the BPD recovered a Smith & Wesson Bodyguard .380 caliber semi-automatic firearm bearing serial number KFW4330 ("FIREARM 5"). According to the BPD report, FIREARM 5 was recovered from the vehicle of Shannon MAHONEY (DOB ▮▮▮ 1983), who did not have a license to carry a firearm and was arrested after the recovery and charged with multiple firearm and narcotics violations. FIREARM 5 was purchased by SENECHARLES on October 15, 2020, at Outer Limits Pro Shop in Holbrook, Massachusetts. During the October 4, 2021, interview, SENECHARLES had informed investigators that he sold FIREARM 5 to Steve's Tactical, but when investigators contacted Steve's Tactical, they stated that they never purchased FIREARM 5 from

10

SENECHARLES.

## II.    ATTRIBUTION OF TARGET ACCOUNTS TO SENECHARLES

27.    During the course of this investigation, investigators determined that SENECHARLES uses the phone number ███████-6041. While reviewing the aforementioned ATF form 4473s and speaking with employees of the respective FFL stores, investigators learned that SENECHARLES provided ███████-6041 as his contact number. In addition, queries in multiple law enforcement databases yielded an association between this number and SENECHARLES, and investigators used the number to contact SENECHARLES on October 4, 2021, and October 8, 2021.

28.    On July 23, 2021, and October 21, 2021, investigators submitted a toll request for 90 days for phone number ███████-6041. The records indicated that the TARGET PHONE service provider is T-Mobile, a wireless telephone service provider. July 11, 2022 T-Mobile subscriber records showed that the phone number was activated on July 2, 2020 and is active, and the subscriber is Klordenzsky Senecharles. The subscriber address is ███████████ Brockton, Massachusetts, 02301, which is SENECHARLES's mother's address and where SENECHARLES claimed on October 4, 2021, that he had a Glock 17 and an XD45 located in a safe. The International Mobile Equipment Identity ("IMEI") number associated with the device is █████████9183, which according to public records is associated with an iPhone 11.

29.    Investigators also learned during their investigation that SENECHARLES uses the email address ███████@icloud.com. On October 8, 2021, SENECHARLES provided this email address to investigators.    Subscriber information for a Cash App account associated with SENECHARLES also included this email address.

30.    Investigators obtained iCloud subscriber records from Apple for all accounts associated with SENECHARLES and the email address ███████@icloud.com and the ███████-6041 phone number. These records established that SENECHARLES was the subscriber for three Apple

accounts, which are the TARGET ACCOUNTS. As of the July 27, 2022 response from Apple, the subscriber records indicate the following with regard to the TARGET ACCOUNTS:

a.     The subscriber name for TARGET ACCOUNT 1, identified by the Apple Account identifying number (DS ID) 16470648379, is "S. Charles." The Apple ID associated with the account is ███████@icloud.com, which is the email address that SENECHARLES provided to investigators and used in his Cash App account. The verified phone number associated with the account is ████-6041, which is the phone number that SENECHARLES provided to investigators and FFLs, and which investigators used to contact him. The mailing address associated with this account is ███████████Brockton, MA, 02301, which is the mailing address associated with SENECHARLES's Massachusetts driver's license and where investigators interviewed SENECHARLES on October 4, 2021. Apple records indicate that this account is a "Full iCloud" account, was created on January 12, 2019, and is active. On July 24, 2020, a black iPhone 11 was registered to this account. The account uses iCloud features including Calendars, iCloud Photos, Contacts, iCloud Drive, Mail, Notes, and the Safari browser. It does not use other features including iCloud Backups, Bookmarks, Documents, Maps, Messages in iCloud, or Photo Stream.

b.     The subscriber name for TARGET ACCOUNT 2, identified by the Apple Account identifying number (DS ID) 17340051461, is "S. Humble." The email address associated with the account is ████@icloud.com. The verified phone number associated with the account is ████-6041, which is the phone number that SENECHARLES provided to investigators and FFLs, and which investigators

12

used to contact him. The account's mailing address is ███████ Brockton, MA, 02301, which is SENECHARLES's mother's address and where SENECHARLES claimed on October 4, 2021, that he had a Glock 17 and an XD45 located in a safe. Apple records indicate that this account is a "Full iCloud" account, was created on July 2, 2020, and is active. Also on July 2, 2020, a black iPhone 11 was registered to this account. The account uses iCloud features including Calendars, iCloud Photos, Contacts, iCloud Drive, Mail, and Notes. It does not use other features including iCloud Backups, Bookmarks, Documents, Maps, Messages in iCloud, Photo Stream, or Safari browsing history.

c.    The subscriber name for TARGET ACCOUNT 3, identified by the Apple Account identifying number (DS ID) 20115485978, is "K. Senecharles." The email address associated with the account is ███████@gmail.com. The verified phone number and iMessage phone number associated with the account is ███████6041, which is the phone number that SENECHARLES provided to investigators and FFLs, and which investigators used to contact him. The account's mailing address is ██ ███████████████ Brockton, MA, 02301, which is the mailing address associated with SENECHARLES's Massachusetts driver's license and where investigators interviewed SENECHARLES on October 4, 2021. Apple records indicate that this account is a "Full iCloud (iCloud+)" account, was created on February 14, 2021, and is active. Also on February 14, 2021, a black iPhone 11 was registered to this account. The account uses iCloud features including iCloud Backup, Bookmarks, Calendars, iCloud Photos, Contacts, iCloud Drive, and Notes. It does not use other features including Documents, Maps, Messages in iCloud, Photo Stream, or

13

Safari browsing history.

## III.    INDICATORS OF FIREARM TRAFFICKING ACTIVTY

31.    As described above, as part of my duties as a Special Agent with ATF, I have conducted numerous firearms trafficking investigations, including investigations into the illegal purchases of firearms, those who have illegally transported firearms over state lines, and those who have illegally possessed firearms.

32.    To assess whether firearms have been illegally trafficked, I and other ATF investigators will examine the "time to crime" of those firearms. This refers to the amount of time between the purchase of the firearm and its recovery. I have found, based on my training and experience, that the shorter the "time to crime," the higher the likelihood that criminal activity was involved in the acquisition of the firearm. Of particular significance to myself and other ATF investigators are situations where the "time to crime" is less than one year, as that undermines the credibility of a target's claim to have forgotten to whom he or she sold the firearm(s) that he or she purchased.

33.    As part of my duties, I also have examined the behaviors of "straw purchasers" of firearms, who purchase firearms using their own biographical information but intend to transfer the firearms to someone else immediately. This act violates federal law because it requires a "straw purchaser" to indicate falsely on ATF Form 4473 that he or she is the actual purchaser of the firearm, when he or she is not. Question 11a on ATF Form 4473 asks: "Are you the actual transferee/buyer of the firearm(s) listed on this form?" It also provides this warning: "Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you." A straw purchaser who intends to transfer purchased firearms to someone else immediately is not "the actual transferee/buyer" as defined in Question 11a, and so violates the law when he or she answers the Question 11a affirmatively.

14

34.     Based on my training and experience, I know that "straw purchasers" often purchase more than one firearm of similar makes, models, types, and/or calibers during the same transaction, while individuals truly purchasing firearms for themselves typically do not.

35.     I have reviewed each of the ATF Form 4473 documents associated with SENECHARLES's firearm purchases and observed that on every form, SENECHARLES answered "yes" to Question 11a and then completed and signed the forms.

36.     Based on my training and experience, and the facts laid out above, I believe that SENECHARLES likely was engaged in firearm straw purchasing and trafficking activity.   For example:

a.      SENECHARLES has purchased multiple firearms of similar makes, models, types, and/or calibers as part of multiple-sale transactions.

b.      The "time to crime" as to most of the recovered firearms was very short:  For example, FIREARM 1 was purchased on December 31, 2020, and recovered by BPD on June 4, 2021, for a "time to crime" of approximately 6 months.  FIREARM 2 was purchased on August 13, 2020, and recovered at the scene of an attempted homicide on December 27, 2020, for a "time to crime" of approximately 4 months.  FIREARM 3 was purchased on January 14, 2021, and recovered by the Philadelphia Police Department on July 12, 2021, for a "time to crime" of approximately 6 months.  And FIREARM 4 was purchased on January 19, 2021, and recovered on January 3, 2022, for a "time to crime" of just less than one year.

c.      Multiple firearms originally purchased by SENECHARLES were recovered from crime scenes or during the commission of a crime.  FIREARM 2 was recovered from the scene of an attempted homicide.  FIREARM 4 was recovered from the

15

bedroom of DEPINA in Boston, Massachusetts and later determined to have been used in a homicide. In connection with the recovery, DEPINA was charged with multiple firearm and narcotics violations. FIREARM 5 was recovered from the vehicle of MAHONEY while she was engaging in alleged narcotics crimes.

d.     And finally, SENECHARLES told investigators that he had resold these and the almost twenty other firearms assigned to him to various FFLs, but the FFLs have no records of any such sales. When confronted with this discrepancy, SENECHARLES's response was to ask how much trouble he was in.

## IV.    TECHNICAL BACKGROUND REGARDING APPLE ID AND ICLOUD

37.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system. Apple also produces numerous applications designed to interface with these devices and provide cross-platform functionality and remote storage of content generated by these devices. Apple provides a variety of services that can be accessed from Apple devices, such as iPhones and iPads, or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time over the data network through their iPhone or iPad. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.     iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps. If a user signs up for iCloud, iCloud automatically backs up information on the user's mobile devices, such as an iPhone or iPad, daily over wifi (when the device is turned on, connected to a

16

23-MJ-7081-JCB
23-MJ-7082-JCB
23-MJ-7083-JCB

power supply, and locked), unless the user manually changes the settings to prevent automatic backups. The backup includes, among other things, purchase history from the iTunes store and App Store, photos and videos, device settings, app data, iMessage, text messages, visual voicemail password, and device settings. The backup includes data that is not already otherwise stored in iCloud. Generally, iCloud Photo already stores photographs and videos in iCloud, so these items thus would not be included in the backup.

d.    iCloud-connected services allow users to create, store, access, share, and synchronize data with Apple devices, such as an iPhone, or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and also on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

38.    Aside from content information, Apple also records and maintains records of certain types of metadata, such as IP addresses utilized by a user to access Apple, and geo-location information derived from GPS/cellular signal/Wi-Fi signal/Bluetooth connections of the device through which the user accessed Apple. Geo-location information for the Apple device associated

17

with an account is stored and maintained by Apple. Furthermore, Apple keeps records that can reveal accounts associated to one another by virtue of the electronic device through which the accounts were accessed, such as the same computer or mobile phone. This includes accounts that are linked by "cookies," which are small pieces of text sent to the user's internet browser when visiting websites. These records, although not personally generated by the user in the way content is created, are a byproduct of how the services are facilitated and offered by Apple. Such records and information can prove valuable in establishing historical crimes and patterns of life, such as frequent travel to a certain location, or persistent historical presence in a residence through continuous connection to a specific wifi network.

39.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

40.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or the user may employ an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). Once created, the Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. Apple also assigns an identifying account number to the particular account.

41.     Apple also captures information associated with the creation and use of an Apple ID.

18

During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

42.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

43.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device

19

identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

44.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, contains data associated with the use of iCloud-connected services including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups of the Apple device associated with the Apple ID account, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

## V.    EVIDENCE STORED IN THE TARGET ACCOUNTS

45.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind under investigation in this case, may be found in the files and records described above. This evidence may establish the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

46.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, text messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the TARGET OFFENSES, and accessory after the fact to those crimes. Based on my training and experience, and information provided to me by other agents, I know that individuals who illegally traffic firearms commonly use cellular telephones to communicate about and further their illegal activities. They use their cellular phones in order to communicate with suppliers, potential buyers, or other individuals potentially involved in unlawful business transactions and will maintain information about these individuals in their contacts lists, in saved text messages, and in other places. These communications occur in a variety of ways, which include, but are not limited to: text messaging (often used in lieu of phone calls to avoid speaking over the telephone), and messaging through applications such as Snapchat, WhatsApp, and Facebook. These communications may be preserved and/or documented in a user's iCloud accounts.

47.    Moreover, I know based on my training an experience that by their very nature, firearms are heavy, difficult to conceal in public, and easily identified by others. Thus, illegal firearms need to be transported, displayed, and sold by clandestine means. Through my training & experience, I know that persons who unlawfully possess and/or traffic firearms and ammunition utilize the digital recording features of their cellular telephones phones to store photographs of their inventory and market it. Cellular phones are capable of showing trafficker's product (such as firearms, ammunition, firearm accessories, illegal drugs, paraphernalia, or other contraband) via pictures that can be emailed,

21

texted, or displayed on some internet-based platform such as social media sites. I also know that when individuals utilize their cellular telephone to negotiate firearms transactions, individuals may send photographs or videos via their cellular telephone, which will depict the make, model, physical condition and functionality of the firearm being offered for sale. Where the cellular phone involved is an iPhone, these photographs and videos often are "backed up" to an iCloud account. The iCloud Photo feature of iCloud permits the user to access all photos and videos generated by the account holder on any device linked to the iCloud account, irrespective of the device used to capture the photo or image or whether the file is present on the device. There is probable cause to believe that evidence of this sort will be located in the TARGET ACCOUNTS because during an interview with law enforcement, SENECHARLES showed law enforcement photographs of approximately four to five of the 28 firearms he had purchased that he had saved on his cell phone. Apple and T-Mobile records indicate that that phone was an Apple iPhone.

48.    I also know based on my training and experience that individuals frequently use cellular phones to create and store records of their actions related to illegal activities by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online to purchase related items. Additionally, many cellular phones today have a GPS navigation device on the phone, and examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where the criminal conduct was taking place, and acts that were taken in furtherance of the criminal conduct. This and a vast range and amount of other electronic data often is "backed up" to an iCloud account.

49.    Based upon my training and experience, I know that gun traffickers often will "dump"

22

(or change) their cellular telephones and cellular telephone numbers in an attempt to conceal their identity and thereby avoid detection. In making such changes, individuals will most often transfer their contact lists and other stored data from their old cellular telephones to their new cellular telephones to maintain contact with individuals involved in their business. I know that individuals also will transfer photographs and videos to their new cellular telephones, which may depict themselves and others possessing or discharging firearms that may be for sale. This information can be maintained in an iCloud account even if it is deleted from the cellular phone or the phone is discarded.

50. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation. Moreover, the existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the smartphone or computer was remotely accessed, thus inculpating or exculpating the smartphone or computer owner.

51. Additionally, iCloud account activity may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information in the

23

account may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicative of planning to commit a crime), or consciousness of guilt (e.g., deleting account information to destroy evidence and/or conceal it from law enforcement).

52.    Examining the above-described data can uncover, among other things, evidence of criminal activity that took place in the past. Based on my knowledge, training, experience, and information provided to me by other agents, I know that iCloud data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.

53.    In this case, I believe the information of this kind that is stored in the TARGET ACCOUNTS will show SENECHARLES's course of travel immediately following the purchase of the firearms, whether it was directly to his actual residence in Massachusetts or otherwise. It will show any connection between SENECHARLES and any known addresses or locations that could help establish how DEPINA and MAHONEY obtained firearms that had been purchased by SENECHARLES. Finally, it will help establish any connection between SENECHARLES and potential co-conspirators who may have taken possession of the firearms that were purchased by SENECHARLES between March 2020 and May 2021.

54.    Other information connected to the TARGET ACCOUNTS may lead to the discovery of additional evidence. For example, the identification of apps downloaded from the App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For example, the applications used by SENECHARLES may also reveal additional accounts, vehicles, communications platforms, or banking institutions employed by SENECHARLES in relation to the TARGET OFFENSES. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the

24

identification of co-conspirators and instrumentalities of the crimes under investigation.

55.    Purchases, transactions, travel, communications, payments, e-mails, concerning this activity, even from innocuous sources such as casinos, property management companies, car dealers, insurance agencies, hotels and financial institutions can substantiate the specific activity that was undertaken by SENECHARLES to commit the TARGET OFFENSES, in particular activity that is associated with efforts to launder proceeds from firearm trafficking. Evidence of such activity is expected to be located within the TARGET APPLE ACCOUNTS.

56.    Based upon the forgoing, Apple's servers are likely to contain stored electronic communications and information concerning the TARGET APPLE ACCOUNTS and the user of the Target Apple Accounts use of Apple's services that will constitute evidence of the crimes under investigation. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users, and to attribute a particular individual or user to a specific telephone number during a pertinent period.

57.    This is true even if SENECHARLES does not utilize Apple's phone automatic back-up service for all of his Apple accounts. iCloud Photo, for example, is believed to sync the content of an iPhone's photo and video library to the TARGET ACCOUNTS automatically, and separately from any full backups of the device through iCloud. Additionally, photos and documents/files can be selected individually to be stored to the remote storage of an iCloud account (known as iCloud drive) separate and apart from the device backup (iCloud) and photo\video library syncing features of iCloud Photo. The same is true of text message conversations through iMessage, which can be automatically synced to an iCloud account, separately from the full device backup.

## LEGAL AUTHORITY

58.    The government may obtain both electronic communications and subscriber information from a provider of electronic communication services and remote computing services by

25

obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

59.    Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g). If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

60.    I submit this affidavit in support of applications seeking warrants to search all responsive records and information under the control of Apple, a provider subject to the jurisdiction of this court, regardless of where Apple has chosen to store such information. Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrants of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Apple's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBERS

61.    I request that these applications, the warrants, the respective Orders, and any related papers be sealed by the Court until such time as the Court directs otherwise pursuant to Local Rule 7.2.

62.    I further request that, pursuant to 18 U.S.C. §§ 2705(b) and 2703(b)(1)(A), the Court order Apple not to notify any person (including the subscribers or customers to which the materials relate) of the existence of these applications, the warrants, each respective Order, or the execution of the warrants, for a period of one year from the date of each respective Order, or until notified by the government within thirty days of the conclusion of the investigation, whichever is earlier. Apple may

disclose the respective Order to an attorney for Apple for the purposes of receiving legal advice.

63.    Non-disclosure is appropriate in this case because the Court's Orders relate to an ongoing criminal investigation.    The investigation into SENECHARLES and his potential coconspirators is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of this still-ongoing investigation.    There accordingly is reason to believe that notification of the existence of the respective Orders will seriously jeopardize the ongoing investigation, including by giving SENECHARLES and other targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, or change patterns of behavior. *See* 18 U.S.C. § 2705(b).    Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Orders, SENECHARLES and other targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

## FOURTEEN DAY RULE FOR EXECUTION OF WARRANT FOR ELECTRONIC EVIDENCE

64.    Federal Rule of Criminal Procedure 41(e)(2)(A) and (B) directs the United States to execute a search warrant for electronic evidence within fourteen (14) days of the warrant's issuance.  If the Court issues these warrants, the United States will execute them not by entering the premises of Apple, as with a conventional warrant, but rather by serving a copy of the warrants on the respective companies and awaiting their production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g),[3] and it is generally a prudent one because it minimizes the government's intrusion onto

---

[3]    Section 2703(g) provides that "[n]otwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."

internet companies' physical premises and the resulting disruption of their business practices.

65.    Based on the training and experience of myself and other law enforcement agents, I understand that electronic account providers sometimes produce data in response to a search warrant outside the 14-day (formerly 10-day) period set forth in Rule 41 for execution of a warrant. I also understand that electronic account providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

66.    The United States does not ask for this extra data or participate in its production.

67.    Should Apple produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Apple, including subscriber, IP address, logging, and other transactional data, without a further order of the Court. This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit. However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account holder(s), such as messages, absent a follow-up warrant.

68.    For these reasons, I request that the Court approve the procedures in Attachment B to the proposed warrants, which set forth these limitations.

## CONCLUSION

69.    Based on the information described above, I have probable cause to believe that SENECHARLES, and others, have committed, are committing, and will continue to commit the TARGET OFFENSES and the TARGET ACCOUNTS are being used to facilitate these ongoing firearm trafficking activities in the District of Massachusetts and elsewhere.

70.    Based on the information described above, I also have probable cause to believe that on the computer systems in the control of Apple, there exists evidence, contraband, fruits, and instrumentalities of violations of the Target Offenses, as described in Attachment B to the proposed

28

23-MJ-7081-JCB
23-MJ-7082-JCB
23-MJ-7083-JCB

warrant, to search the respective Target iCloud Accounts, as described in Attachments A-1, A-2, and

A-3.


Sworn to under the pains and penalties of perjury,


_Michael Romeo_

Michael Romeo
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

The affiant appeared before me on this date, by telephonic conference or other reliable electronic means, pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Subscribed and sworn to on
This __13__ day of February 2023.


_Jennifer C. Boal_

Honorable Jennifer C. Boal
United States Magistrate Judge

29